All right, we will hear first from Mr. Forbes. Good morning, your honors, and may it please the court, Jesse Forbes on behalf of the appellants in this matter of the consolidated action. We are here today as a result of a warrantless entry into a home with no exigent circumstances and no consent, despite the district court opinion and the defendant's representations at the district court level. This matter began with a motorcycle chase involving a West Virginia state trooper. There are factual disputes as to how that chase started. The trooper initially made calls saying that his vehicle had been struck by the motorcycle. He later admitted it had not been struck by the motorcycle. He had varying statements throughout that time. It's in dispute as to exactly what he was pursuing the motorcycle for. What's not in dispute is that he ended that motorcycle pursuit and then engaged in cold police work. He went back to the scene where he had first seen the motorcycle. He interviewed the people who had told him about the motorcycle, and then he found where the house was. Can I just ask, doctrinally speaking, why does any of this matter? Because, just as I understand, the district court said the search claim, the entry claim, fails because of consent. I understand you disagree with that, but that was the base. It wasn't hot pursuit. It wasn't exigent circumstances. The basis of the district court's holding was consent, and I don't see why any of this matters to consent. And then, again, one could disagree with this, but under the way the Supreme Court and we have done excessive force claims, candidly, it does not matter what happened before. It matters what happened in the moment they shot, but nothing that happens before that matters for excessive force purposes. I understand, Your Honor, and agree that ordinarily it would make no difference what happened on the front end of this, except that all of the deputies, despite the district court's opinion, all of the deputies in this matter testified that their reason for going into the mobile home was because of consent. It would be a great argument if the Supreme Court hadn't said over and over and over and over again that under the Fourth Amendment, with all respect, I do not care what they subjectively intended to do. And I understand that as well. The issue is they have to have a reasonable belief that they have consent. They never believed that. They never in any way... No. A reasonable officer has to object... It has to be objectively reasonable for a hypothetical reasonable officer to believe they had consent. It doesn't matter if these individuals believe they had consent. And notably in this matter, there was no consent. Great. That I totally get, why that's a really important issue. And it's an extremely important issue because there is no consent in this case. They are inferring consent from silence. The only two living people that were in this house that have testified said they never unlocked the door and that they never went to the door to unlock it. There is no engagement by the law enforcement officer similar to other cases the United States Supreme Court and this court has reviewed. There is no engagement by that officer where they could infer in some way that they were given consent. This isn't a situation where someone called... We're not broadly contending that the only consent that qualifies as consent must be verbal. No, Your Honor, I'm not... I don't understand you to be making that broad an argument. And we are not here, Your Honor. What we are making is... You could nod your head or you could go, you know, something like... You certainly could wave someone in. You could acquiesce through circumstantial, essentially circumstantial evidence of, yes, I'd like you to check on my husband who has a gun. I'm worried about him. And you have the ability to let them... I guess the example is I open the door, I see you there, and then I turn around and I walk back down my hallway. I think we would understand a reasonable person to have been saying, follow me. Come with me. That didn't happen here. In fact, the deputy's testimony and the evidence in this record is is that they banged, banged, banged on the door after they had decided to go in. The trooper actually testified that when he set the perimeter up, the deputies had already decided to go into the house. So what is your explanation of why the door opened? Well, it's a factual dispute in this matter, but we believe the door opened because if you watch the body cams and you listen to the testimony, it had been banged on multiple times by the state trooper and the Charleston police officer, then 45 minutes later the deputies go up on the porch and they bang three different times on this mobile home door, and the door came loose as a result of the banging. In fact, it's in dispute as to whether the footsteps that the deputy alleged to have heard behind the door, whether those occurred before the last time he banged on the door and it opened or earlier in that scenario. And so this was a... I mean, this is not a... The door could have opened also simply because it's loosely hinged or loosely locked or some breeze or wind blew through it. I gather what you're saying is it doesn't necessarily need to be banging. It opened the door. What you're saying, as I understand it, is that there could be a lot of different explanations for the opening of the door, none of which would have involved consent. That's correct, Your Honor. In this matter, there was no indicia of consent. There was nothing where the door opens and these deputies see someone inside who then scurries back to a bedroom. In fact, they never see anyone inside of the structure. Why? Was there a chance to get a warrant here? There was over an hour that they were on this scene to get a warrant. And we asked each one of the deputies... Normally you can get a warrant through radio. You don't have to personally appear before a magistrate. But was there any effort made to get a warrant? Zero. There was no effort in this matter to get a warrant. And they all testified. They had cell phones. We put in the briefs because it's clear there were at least 14 officers there. When you watch the body cam, there were probably 20-some officers on this site. They all knew and they all had radios. They had cell phones. There was a TV reporter that was out there filming them. That was one of the things I want to ask the other side about. But that was one of the things that concerned me. I think there's a higher privacy interest in a home than there is maybe in an automobile or a higher privacy interest in a home or telephone conversation. And as I understand it, the government abandoned any kind of hot pursuit theory? They initially launched into that theory. The motion to dismiss stage, they argued hot pursuit. It was denied. Throughout the discovery, it was proven that the hot pursuit was a fallacy. It didn't happen. Now, the deputies continued to hang their head on that in the testimony. But ultimately, at the Rule 56 stage, they filed a motion now arguing that they had consent because one of the deputies mentioned that he'd heard movement in the house. So was there an evidentiary hearing on all of this? No, Your Honor. There was no oral argument or evidentiary hearing. Well, I mean, was there an evidentiary hearing on the consent question? To be honest, the consent question concerns me. I thought that was your strongest claim. And we agree, Your Honor. I think the other claims, and I'm speaking purely for myself, I thought the other claims were considerably weaker. But I think the consent claim is something that I'm really torn about because it was somebody's home and because there was no warrant and because there could be so many non-consensual explanations. And I don't understand, with respect to this consent issue, why wouldn't there have been an evidentiary hearing? Well, we had deposition testimony in the matter. Okay. And so there was evidence in the record. In fact, there were probably a dozen depositions taken, all of the officers. But normally in this kind of situation, you might expect live testimony. You're correct, Your Honor, and there was not here. But regardless of that, there was no evidence in this record of consent. And it's a slippery slope if you think about this district court opinion. In the modern era, with ring doorbells and the ability to push your phone and open the door and allow it to open, there are a lot of ways that a door could open with no one intending to give consent to the person on the other side of that door. And the courts have been clear that there is a duty from the police to seek a warrant if they have time. So in your remaining time, can I take you to the use of force claims? I guess in the interest of continuing judicial candor, I find your claim involving Mr. Toon to be challenging. So I guess my questions are Ms. Quinn, where I find your claim to be stronger. Is essentially the dispute there whether—well, I guess you don't disagree that as a general matter, if I intend to use force against X and I end up hitting Y, Y doesn't have a Fourth Amendment claim. I think as a general matter, if you look at the case law, that is the case law, and that just because you mistakenly shoot the wrong person, it doesn't necessarily give you— Okay, so then that's setting up my next question. Do you agree that with regard to Ms. Quinn—and again, I guess I actually— I'll just fold a card on the table. It strikes me that they would have had a plausible argument maybe that even if they intended to shoot Ms. Quinn, that's still not a Fourth Amendment violation or they still get qualified immunity. But I read the district court's opinion, and that is not the ground on which the district court ruled. The district court ruled the reason there's no Fourth Amendment violation question with Ms. Quinn is because no reasonable juror could conclude that the officer intended to shoot Ms. Quinn. Do you understand that to be the basis of the district court's holding? I do, Your Honor, although I believe that all of those holdings really flow from the decision on the entry of the home. See, again, I just don't think that works as a matter of Fourth Amendment doctrine because I think the way the Supreme Court has done this in Graham v. Conner and Tennessee v. Garner, I think I have to ignore whether or not there's a problem with the entry of the home, and I have to ask about the moment they shot. And there's disputes over the time here as to the moment they shot. But do you agree that the sort of linchpin of the district court's analysis is is there a genuine dispute of material fact from which a reasonable juror could find that the deputy intentionally shot at Ms. Quinn? Yes, Your Honor, that's what the district court held. Okay, so with having identified that, explain to me why the district court was wrong in concluding there is no genuine issue of material fact about who he was intending to shoot when he shot her. When you watch the body cam video, Toon comes around the corner of the house. He's shot by the Charleston officer. The trooper is in the tree line on the edge of the house, essentially setting a perimeter for this violation when they come in. He's setting that perimeter. He then shoots Toon. And there's a dispute as to how long Quinn is hanging from the window. This is a young lady that was in her pajamas at 9 o'clock in the morning in bed. All of this happens. These people flood into the house. She jumps out the window after Toon does. She's unarmed. She's in her pajamas. She's not a suspect of anything. But at that time, we believe that it is a factual dispute as to whether or not Trooper Zirkle actually had an intention to shoot everybody that was coming out the window. He's indicated that he didn't intend to shoot her. We understand that. But we believe, circumstantially, if you watch the body cam, where Toon is is not where she is. And we think that a juror could infer from the body cam evidence and Ms. Quinn's testimony that she was hanging on that window and that Zirkle was frightened and had fired and fired and fired. Which, in fact, and this will be a dispute if we get remanded, he's had other shooting incidents where he's shot the wrong person and shot multiple people. The district court says that's all well and good. But applying Scott v. Harris, I have to deal with situations where undisputed record evidence establishes X. And as I read the district court, what the district court judge says is, OK, but the one thing we can all agree on, and I've listened to and watched this footage as well, that all of the shots happen within a little more than two seconds. So any chain of events that requires the shots to take more than two seconds is, in the language of Scott v. Harris, blatantly contradicted by the video. Because I've listened to that video and all of the shots. Do you disagree with the district court that the footage conclusively establishes the amount of time it took for these shots? We disagree with the defendant's analysis as to the exact amount of time, but I don't disagree that it was more than two seconds. So, for example, if her account is, he was shot, and then ten seconds later I got shot, that is blatantly contradicted by the video. It's not on the video evidence, Your Honor. No, no, no, it's not on the video. If that was her story, that story would be blatantly contradicted by the video. It may have been, as opposed to story, a perception of someone who'd been shot. Perception, right. No, guys, this is a frightening situation. She's terrified. I don't mean to suggest that she would be lying. I just mean, like, a lot of stuff's going on. People can get things wrong. But I agree with the court's analysis that this is a matter of a couple of seconds. This is not a matter of the shooting period. Right. The problem is, there's other circumstantial evidence. Toon is around the corner. He's shot in the head, and you can see where he is, and you've got Whittington testifying, who was the Charleston officer that shot him initially. He's testifying that Zirkle shoots him in the head around the corner. That's not where she is. This is not like he missed that shot and it went past there into her. And that's the part where we think the district court got it wrong. There is a factual dispute about what he did. Now, a jury may go against us, but that ought to be her right to have the jury decide that and not have the district court decide it. Your Honors, we believe the Fourth Amendment protections. It protects against the chief evil of entry of a home, warrantless, with no exigent circumstance and no consent. There is no consent in this case. There is nothing to infer consent from. There was no one past that door when it opened. They had banged and banged and banged until this mobile home door opened. And the deputies told the trooper that they were going to go in beforehand. It's in Zirkle's testimony. It's in the record where he knows that's what they're doing before they bang on the door. So we believe, Your Honor, that this is a strong case to be reversed and remanded so that we can go to trial on those issues. Thank you. Yeah, I'd like to ask you some questions. Oh, yes. Can I? Now, you spend a lot of time on the consent and those things. I'll make it clear now. With the questions Judge Hyden was asking you, you'll be careful with the record because what he said is that the two seconds, do you agree that from the time the gentleman was shot in the head and when the lady was shot, it could not have been more than two seconds between those two events. Do you agree with that? I'm not. You'll be careful because that was the question being asked of you. And that's why I'm asking you, do you say the record says that could not have been more than two seconds between his being shot in the head and her being wounded in the back? I don't agree with it being two seconds, Your Honor. I do agree that it's not a giant matter of time. Certainly, you can listen audibly to the shots, but we don't agree that it was a two-second period. Okay, well, yeah, because when he was shot, he was on the ground, right? Yes, Your Honor. And that window was at least, what, eight feet or more above the ground? Oh, at least, yes, and around the corner. I mean, he makes the corner when he's on the ground and shot. Right, and wasn't her blood on someone who was in the home? Her blood, I don't believe her blood was on, was inside the home. No, no, on someone who was in the home. It was certainly on the deputies and the police officers once they came out. I think it's disputed as to when the blood would have come on to them. You said some of the police officers? Yes, sir. Who were inside the home or out there in the yard? Well, they all come out of the home after the shooting, and then some of them tend to her. So there's blood on, there's certainly blood on them. I guess it would be a question as to when or how the blood got on to them. But there is blood on the officers. And the police officer said it was no intent to shoot her? The trooper testified that he did not intend to shoot her. And we understand that, but we believe that circumstantially that doesn't match up with what happened. And regardless of that, she's subject to the Fourth Amendment violation. Now, whether this goes to a damage issue of whether we can prove to a jury that the shooting of her was a result of the Fourth Amendment violation, we believe that's a damages issue. But certainly there's a Fourth Amendment violation initially, and then she shot, and we believe there's circumstantial evidence in this record that demonstrates that he did intend to shoot her. And no one ever said that they thought she had a weapon coming out of the window? No, in fact, it's undisputed that no one believes she had a weapon. In fact, the tune, the testimony is he armed himself after the deputies came into the house. That's disputed by them. I just have one follow-up on that, and I did not mean to suggest you're conceding it's two seconds. I guess you're just not asserting that a reasonable jury could conclude there are any shots fired other than the shots heard on the video, regardless of how long that specifically was. That's correct, Your Honor. Okay, that's all. Thank you. Mr. Hill? May it please the court, Cy Hill here on behalf of the Kanawha County deputies. That would be Sergeant Lively, Sergeant Kegler, Deputy Kaye, and Deputy Miller. And I think the court is well aware at this point the really only issue that pertains to my clients is this entry and consent issue. And just to make clear to the court how this hot pursuit argument kind of made its way, I'm not going to indulge it because I don't think the district court passed on that. We didn't raise the issue of consent in a motion to dismiss because they didn't plead any facts in the complaint about the door opening and things like that. So for 12B6 purposes, I didn't feel that I could raise it. I had to develop those issues through discovery and take it up on summary judgment, and that's when that issue came to the forefront. And we would submit that the district court properly determined that the question at issue does not turn on whether the plaintiff's actually intended to consent to the defendant's entry, but rather the question revolves around whether the deputies were reasonable in their belief that they had consent to enter the premises, even if that later turns out to be incorrect. So I totally agree that that's the right legal question, but I want to make sure I understand. So you don't contend—let's just say I show up at someone's house and the door is open. Maybe it's a hot summer day in the American South or something, right, and the door is open and there's no one standing there. That is not implied consent to enter, right? Correct. And a reasonable officer could not believe that's implied consent to enter. Correct. Now let's say that I'm standing on the sidewalk outside of someone's house, and I see something that's very clear what happens. Let's just say the person has an old door like I had in my old house in Charlottesville, and it's very obvious that what just happened is that the wind blows the door open, right? And no one's standing there. No reasonable officer thinks that's consent to enter the house. I believe that would be correct. Okay, and so in other words, there's parts of the district court's analysis that basically seem to say, well, who knows why the door opened, but the officers could have believed from the fact that the door opened that they had—because I guess their hypothesis is, well, I didn't open the door, and because I didn't open the door, the fact that the door opened is itself implied consent to enter. That would not be correct if that's what the district court said, right? Well, yeah, and I think we have to back up a little bit because there's testimony in the record that Trooper Zirkle and Officer Whittington from the Charleston Police Department had previously confirmed that the door was locked and secured. No, I understand. And so by the time the deputies enter onto the porch, again, it's locked and secured. At no point during the time that they were out there did the door open and close. So another way—okay, so let's say the last typo on this. Say, in fact, what happened is this is an old door on a mobile home, and a bunch of people had just been banging on it, and after a bunch of people bang on an old door, sometimes that door fails and may not fail immediately. It might fail a little bit later, right? And let's say, A, that is what happened, and let's say, B—I suspect you're not going to agree with this part, but for purposes of my question, let's just posit that a reasonable officer would have known that's what just happened. If that was the case—and again, I'm sure you don't agree with the second part of that analysis—but if that is the case, you agree, that is also not consent to enter. I would agree. If they banged on the door, for instance, and it was quite obvious that when they hit the door, the door immediately swung open because the lock or the wood holding it in broke or something, and the door came open. And that wouldn't matter—and by the way, it wouldn't matter if that failure took 30 seconds. Like, I bang on the door really hard, I turn around, I walk back to the street, and then, you know, I mean, like, think about something in movies and television. I hear this creak, like, it's so obvious that what happened in this moment was that my banging caused it to fail, and it just delayed opening. You'd agree there's no consent there? Correct. So, the central question in this case is whether a reasonable officer could have believed that someone in the house opened the door. That's— Correct. Okay. The facts that we have on that, of course, Zirkle and Whittington had previously knocked, Sergeant Lively knocked twice, and that's after the second knock and announce is when they heard something behind the door and somebody fooling around with the lock. Why isn't our—but, fair, but I guess counter-argument, the people inside the house testified, no, I didn't. Why doesn't Bonner just indicate this is a genuine dispute of material fact about whether there's a Fourth Amendment violation here? I have an issue with Bonner because it wasn't a consent case. The issue in Bonner revolved around exigent circumstances and the failure to properly knock and announce, and there's no question in this case there was a knock and announce. No, but the issue in Bonner, like the issue in this case, is what could a reasonable officer have believed under the circumstances about whether the people inside were letting you in? Correct. It's not—are you going to say doctrinally it's not—I mean, the issue seems to be basically the same. Right, but in that case, though, the door opened and then someone closed it, which to me— Well, no, an officer testified that's what happened, and the people inside the house said that is not what happened. Right, and there's no question here that no one opened the door and closed it, or, you know, there's no—I guess I would say it's factually distinguishable from Bonner for that reason, and the issue of consent was not addressed in the Bonner case. But in this particular case, I think the other issue, and I think it's important to note, is if there's some other hypothesis about why the door opened, and from our qualified immediate perspective, I don't think it matters, but Taylor Quinn testified the door was not damaged. No one has said that the deputies applied any force to the door other than knocking on it. But she's also testified that neither she nor the other people in the house—I mean, if you want to start talking about Taylor Quinn testified, Taylor Quinn testified that neither she nor anybody else in the house under any circumstances opened that door. That's correct. Of course, the officers would not have known at the time what their intentions were or what they intended to do, and I, again, don't believe it would matter here, but— You know, how could it be consent if, in light of the previous banging, the door was not opened by someone inside? I mean, if an open door—if there hadn't been the history of it, but you have the—as far as I can tell, two sets of officers banging on the door asking for someone to come in, and they said, no, you know, they didn't open the door at that point. So why, in light of the previous refusal, could the fact of the door opening be construed as someone's consent, or at least I would think that there would be a genuine issue of material fact as to whether this was consent or not? And there are so many other explanations for why that door might have opened that don't involve any kind of consent at all, and the jury could have found one of those many other explanations for the open door to be credible. Right. Well, I think the issue here, as far as qualified immunity, is were the officers reasonable in believing that, even if it later turns out not to be true? Of course, at the time, they didn't have any idea what the people inside intended. But could an officer, you know, turn it around on you? Could an officer reasonably believe that consent was given? In fact, in view of the fact that there was no consent, no open door, no manifestation of consent during all the previous interactions between the officers and the— between the officers and the residents of the trailer. And that gets to a fact that we haven't gotten to yet, and of course we'll never know what their intent was, but I think a logical inference could be made that these officers were essentially baited into the home. Because after they entered, there is a bear trap set in the floor of the residence, which Ms. Quinn said was to catch a rat or something like that, but within 45—my officers are there for 45 seconds when Mr. Toon flees out with the AR-15, and that's when, of course, everything happened outside. Ms. Quinn testified that it was his plan all along to flee and get back to the motorcycle and leave the scene. In terms of qualified immunity, I think there would still—the law of consent still requires that there be some objective manifestation of consent. And, you know, I'm just puzzled by this situation and why, when you're talking about an entry without a warrant into this individual's home, when you had time to get a warrant and you didn't get a warrant, and when there's no manifestation of consent and such objective manifestation as there is in the light of the previous banging was, no, we don't. I mean, you're talking about someone's home. Yeah, I understand, Your Honor, and I think the issue here is, if the issue can be argued either way, and I think that it can, I think the officers could have been reasonable in believing that consent was given. An argument could be— You could have called in and gotten a warrant, couldn't you? They could have, and I would also say, Your Honor, if the door had not opened— Why didn't they take their cell phone and call the magistrate? You know, the officers have the phone numbers of magistrates whom they can call at any hour of the day or night and try to get a warrant. They could have. There's no question, I don't think there's anything preventing them from doing that, and that step may have eventually been reached if the door had not opened because, as they stood there on the porch, they had no way to get in, and if the door had not come open, they had no tools to get in, they couldn't kick it in because the door opened out. If the door had not opened, I would have to assume they would have to stop and discuss, what are we going to do now? Because had the door not opened, we don't have any reason to believe that they would have even had access to entry into the home. Are you aware of any case—because you keep saying a reasonable—honestly, this question did not occur to me until something you were just saying. Do you know of any case stating in a 1983 action alleging an unreasonable search where the issue of consent is raised? Which side bears the burden of proof on the consent or lack of consent issue? If it's an issue, I have not looked into that specifically, and I have not seen any Fourth Circuit case that specifically addressed it. I don't think I have either. And so that goes back, I guess, to our point, too, is even if the court has an issue with consent here, I don't believe that— Well, no, I think that might cut against you, because in one way there seems to be an argument that it would be the defendant who bears the burden of proof. That is to say, conduct that otherwise violates the Fourth Amendment doesn't violate the Fourth Amendment if there was consent, which suggests that consent would be an issue on which the defendant would bear the burden of proof. Well, I believe on immunity purposes the law still has to be clearly established. Sure. So I think that's where we have an issue, too, is I'm not aware of any case in this circuit under facts similar to this— What you're really worried about here, and at least I worry about it, is I'm worried about the residents of trailer parks not getting the same kind of respect that the residents of homes and freestanding homes, brick homes, and free homes in a different kind of neighborhood. And I'm worried about officers thinking, well, this is just a trailer park. We can do what the heck we want, or we can sort of take shortcomings. And that's not where I'm at, because it may be a trail park, it may be a trailer, but it's their home. That's where they live. And, you know, I just worry about police officers taking shortcuts in a trail park that they wouldn't take in a more upscale residential neighborhood. And that's not what we want. I understand, and I agree. I don't think there's any evidence of that here. I mean, the officers didn't show up and immediately try to start kicking the door down or things like that. It's part of the facts of the case. At any rate, I'm going to ask my co-panelists if they have some further questions of you, Judge Gregory. I do not. Thank you. All right, thank you. All right, Mr. Mullins. Thank you, Your Honor. My name is Michael Mullins, and I'm here on behalf of Trooper Zirkle and here to address the issues with the court's opinion secondary to the use of force outside of the home. And it's my position that the district court correctly determined that the decision to use deadly force in response to Mr. Toon's threat was reasonable. They found that this was constitutional under the Graham v. Conner analysis. Under Graham v. Conner, you have to look at the severity of the crime, whether or not the suspect is an immediate threat to the officers or others, whether or not the suspect is actively resisting or attempting to evade arrest. All this is supposed to be done without the police. Well, the thing that comes through when you read Graham v. Conner and the different cases that follow from it is that the Supreme Court, which I always do my best to follow, is putting all the emphasis on rapidly evolving, rapidly unfolding situations. And if they're required to make split second judgments, and this seems to be one of those situations. One of the officers had an AR-15 gun pointed directly at him. I mean, an officer would reasonably, is bound to reasonably sense that this is a situation where it could be of ultimate danger. And the whole setting here, I don't think you can, I'm not sure that the case breaks down into the two seconds or five seconds or what have you. But as I said, the first part of this case dealt, in my judgment, with a situation where the officers had time to go and get a warrant and to take their time and play it by the book and turn the square corners. But then you get to the second part of the case after the exit and everything. And that, in contrast to the first part of the case, is a situation where the officers didn't have much time. It was just unfolding in a sequence. And you're talking about a situation where somebody was pointing a gun at somebody and never required that they put their life in danger or make some kind of family parsed distinction. So it's all a question, I think, of time. When the officers have time, they've got to turn really square corners. When the officers' lives are in danger on a rapidly unfolding situation, then I think the presumption is reversed. It gives them some latitude. But the case breaks down in a kind of a bifurcated situation. Very different. See what I'm saying? Absolutely, Your Honor. And I agree with you. I think you were on this decision in the Anderson v. Russell case, which is 247 Federal 3rd, 125, basically holds the proposition that a police officer doesn't have to wait for the suspect to take the first shot. And in this situation, when Mr. Toon came out that window with an AR-15, he initially kind of goes to the ground and he's on all fours and he's raising up. And Whittington, who's not even a party to the case, shot him first. There were seven shots that took place. And if you listen, as Justice Heaton pointed out, those shots took place in approximately two seconds. We have the audio that sets that forth. Okay, so let me just posit, again, speaking purely for myself, I think everything you're saying works really well for Toon. So I'm asking about Quinn, and I'm only asking about Quinn. And I further want to emphasize, I could imagine an argument being made, look, this was a crazy situation, and this man was pointing an AR-15 at me, and I reacted really quickly. And then I see another person coming out, and I don't know, like, if he's got a gun, she's probably got a gun. So I shot her, or in a moment, I wasn't even thinking, I saw the first person who I was justified in shooting, and then I see the second person. And so maybe I made a mistake by shooting her, but that doesn't violate the Fourth Amendment. It's not clear. None of that is the basis of the district court's holding, right? Not, I panicked and accidentally shot the second person for no good reason, or I panicked and shot the second person because I thought she might have a gun, too, any of that. The basis, and I think the only basis of the district court's rejection of Quinn's excessive force claim is no reasonable juror could have concluded that the officer intentionally shot her, too. Do you agree that is the basis of the district court's ruling? I believe that is correct, and that because the shooting of Quinn was not intentional, therefore it's not a violation of the Fourth Amendment. But that's the only basis of the district court's holding on Quinn. Okay, and so if we think they're, so in other words, this entire case to me reduces down to the question, could a reasonable jury conclude that he intended to shoot Quinn, regardless of whether that was justified, regardless of whether that was, I mean, like, this is a preview, I guess, I think you might win in the end on some of these other questions, but you agree the only question before us right now is could a reasonable juror have concluded that the officer intentionally shot Quinn, as opposed to intentionally shot Zirkle and, not Zirkle, I'm sorry, Toon, missed and hit Quinn? That's really the only question? You lost me on the last one. Is the only question whether or not a reasonable juror could conclude that your client intentionally shot Quinn? I believe that's exactly what the court, district court hung its hat on. And so if we think there is a genuine dispute of material fact about that, your ruling, the ruling on Quinn's excessive force claim has to be vacated. I believe you're correct, Your Honor. I'm not sure you do agree after your briefs. I'm a little bit puzzled as to why you say the only question is whether there's a genuine dispute of material fact. That is not what I, you're leaving out the whole qualified immunity aspect of the case, and that is qualified immunity indicates that officers may make mistaken judgments, and that all but the most incompetent, that's Mallee v. Briggs, I think, those judgments will be credited. There could be a dispute of material fact over something that yet would not impeach the qualified immunity defense in a suit for damages. And the immunity is an immunity not to be tried. And it is a normal summary judgment standard can be the be all and end all because it overlooks dozens of Supreme Court cases that give officers some judgmental latitude in rapidly evolving situations. So as I understand it from the reading from your briefs, you had two alternative arguments. And number one is there could be no dispute of material fact that this was a rapidly evolving situation. And number two, you've got to, even if that was, this still belongs within the realm of qualified immunity, which is to protect judgmental exercises on the part of police. So you're not abandoning that whole second prong of your argument, are you? Correct, Your Honor, I'm not. And the Milstead decision, which is also a case that you were on, addresses that. You can make a mistake of fact and you can make a mistake of law. And here, what the plaintiff wants the court to believe is that it was a mistake to shoot her. And he was not trying to shoot her. This whole thing happened in two seconds. But two things. First, you agree that the omni-excessive force claim involving Quinn, the district court's holding was based on no constitutional violation, not based on qualified immunity. Correct, but qualified immunity is a two-parter. Sorry, that is confusing and that's the court's fault. When I say qualified immunity, I mean the clearly established prong. Because on the entry claim, the district court did the belt and suspenders of there's no constitutional violation, and even if there is, it wasn't clearly established. But you agree that when it comes to the shooting claim involving Quinn, the sole basis of the district court's holding is no constitutional violation, right? Correct. The court decided there was no constitutional violation, so therefore it didn't address the second prong. Right, exactly. And then the second question I guess is, if he intended to shoot her, again, this goes back to my question, I think you may actually have a winning qualified immunity defense at the end of the day, but if he intended to shoot her, the defense can't be, and a reasonable juror could find that even though I intended to shoot her, maybe I didn't intend to shoot her. Your defense would then have to be, even if a jury finds I intended to shoot her under this tense, rapidly evolving situation, it either didn't violate the Fourth Amendment to shoot her, because officers make mistakes under rapidly emerging situations, and whether you can shoot someone who doesn't have a gun, but who's in proximity to someone who has a gun, is probably something this court has not clearly decided, and they probably can conclude that's not clearly established. But that would be a different basis than the one the district court gave, right? Correct, your honor. I agree. Getting back to addressing a couple of factual things with the Quinn part of this, I think it's important to not only focus on the audio from Barnett's body-worn camera, but it's also important to look and pay attention to what Taylor Quinn testified to. We know that in the audio it only took two seconds, or approximately two seconds. We have an expert that timed it multiple times with a stopwatch and said that it only took two seconds. And what Taylor Quinn testified to is that she would not have come out the window if she had heard the shots fired. So she was coming out the window before the shots fired. This is the very definition of a tense, rapidly evolving situation. There's no evidence to support any inference that Zirkle saw Quinn exiting the window. If he was shooting at the decedent, and in the process, he hit her, and it was a mistake. And whether it was a mistake under Milsteed, if it was a mistake, he would be entitled to qualified immunity. And under all the other decisions that were relied upon by the court... But if it wasn't a mistake, he may not be, right? If it was intentional? If he intentionally shot her, which are the facts in this case, but if he was aiming at her and trying to hit her... What do you mean it's not the facts in this case? He shot her, right? He shot her, but he was not aiming at her or trying to shoot her. So how are the facts of the case would determine intent, whether it's intentional or not? Well, the judge... I'm talking about the judge. I'm talking about the facts right now. What about the facts would clearly say it could not have been intentional? Well, you have the officer's testimony that he didn't see her coming out. You have the time... Is that a fact? It's a fact. He didn't see her? I mean, it's testimony, right? It's testimony, right? Sure. And it's a question as to the intent, though. I don't believe so. I mean, there could be a question to the intent, but there's nothing... that he wasn't trying to hit her, that he wasn't aiming at her, that he wasn't trying to shoot her. But he did shoot her. He did shoot her. Well, I don't know that we even know that for certain, but we have accepted that for the purposes of this motion, but there were other... You mean you don't even know that? We suspect that, but there were shots that passed... A lot of facts are still open even to that, right? You just said, you just opened up a new fact. Well, there's two officers that shot, we know. One of them shot four times, one of them shot three times. Some of the shots went through the decedent. Some of the shots didn't hit the decedent at all. But a jury looking at all of those facts may come to the conclusion that that wasn't an intentional shooting of Ms. Quinn. I don't think so. Well, you just said, you can't even tell us who shot her. So how can you be... I mean, your counsel, you're doing a good job. You're an advocate, the court determines, but it's the jurors, they're the ones, not the judge in the case, that would determine whether or not... And that's what he was holding. He said, no jury could determine on these facts that it was not intentional. And you're telling me you don't even know who even shot her. We've accepted for the purposes of... No, your acceptance has nothing to do with whether or not in terms of what the jury is going to be able to say. They're not going to be worried about what you accepted. They're going to be worried about what people say on that witness stand and what she said and those things, and they may determine that. That's what our framers said, you have a right to a jury. They knew what they were doing. You know, because you used to be saying, you know, you get a... And this has nothing to do with anybody in the court, but the old saying was, you know, just plain to say, a bench trial is a slow guilty plea. You know, that's why people have juries, because it's 12 people sitting there, and they're all citizens, and they look through their eyes and their common sense, and they look at the facts based on instruction. And you just tell me even more so why the facts still... But go ahead, go ahead. Well, Your Honor, I think that I've addressed what I intended to address here. I think you did. I don't have any questions. I don't have any questions. It was a quick, rapidly evolving situation that even the plaintiff's own expert... Well, the whole point is qualified immunity is a right not to have to go to trial. If you go before a jury, the immunity is lost, and the Supreme Court has indicated in Mitchell v. Forsyth that these cases should be resolved at an earlier rather than a later stage, because the immunity is essentially... It's not just an immunity from ultimate liability. It's an immunity from the time and expense and all the rest that litigation imposes. And so I think looking at this, we can affirm the district court on any basis. And I think looking at this, if qualified immunity has some meaning, I think looking at this through the lens of qualified immunity is probably the best way to go at it. I agree, Your Honor. The district court could have decided on qualified immunity. And again, it's a two-part analysis, and the court lets them do it in whichever order they want to. And here she said there was no constitutional violation. All right. Well, we've given you some extra time here. I want to hear from Mr. Forbes and rebuttal. Thank you, Your Honor. To follow up on your point about qualified immunity, it certainly is an immunity not to go to trial when there aren't factual disputes that might take away that issue of whether there's a clearly established law, whether they have that there. Here there are, to Judge Gregory's point, a number of factual disputes about what happened with Taylor Quinn. And you've got to remember, too, she doesn't just have the damages from being shot outside the trailer. She has the damages of these people breaching her home, coming into her home, frightening her to the point where she jumps out a window. So there's additional issues here that need to be resolved by a jury. That gets back to what Judge Hyten said earlier that the Supreme Court cases and our own cases say you can't travel, you can only travel so far back into the context, and there's a question of whether the incident should be, whether the consent or lack thereof, whether that should bear on the rapidly evolving situation that occurred after the two people had exited the windows and one of them had pointed an AR-15 at the officer when he was getting to his feet. In other words, I'm just not sure that the Supreme Court allows us to go back in time in the way that you're talking about. Well, and I think it gets to whether this is really a rapidly evolving situation. To Judge Gregory's point earlier, Judge Hyten's point, the amount of time here, certainly the shots occur quickly, but it's in dispute as to how long she's hanging out the window. It's also in dispute as to whether her going out the window resulted in her being shot. And I mean, I don't think that is a bridge too far here to say that they have an hour at this place. They don't get a warrant. They set up a perimeter. Trooper Zirkle actually testifies, and this is why we have the bystander liability claim. He actually testifies. He knows they're going to go into the house, and he sets up in the trees with a vantage point of that window. The idea is they're going to flush people out, and I think that's a factual dispute here as to what he's doing. But just in the brief time I have left to kind of address a couple of the issues, we think this is different from Milstead. This is different from a situation where you shoot the wrong person. He didn't think she was the person with the gun. He never thought that. He's in the tree line. He shoots after the Charleston officer shoots the person that pointed the AR-15 at him, and we did not file suit against the Charleston officer. There was an analysis of that, and certainly you've all seen the body cam video. The Charleston officer has that gun pointed up at him. That's very different from Trooper Zirkle who's over in a tree line and starts shooting at everybody after this starts, and he shoots the innocent girl who's coming out in her pajamas who's done nothing wrong. To Judge Hyten's point, I'm not aware either of a particular case in this circuit on who bears the burden of establishing that the Fourth Amendment violation wasn't justified, but it's presumptively unreasonable to come into someone's home, as Judge Wilkinson's point, to come into someone's house, whether it's a trailer or whether it's a mansion on Park Avenue somewhere. It is presumptively unreasonable to come in without an exigent circumstance, without a warrant, or without consent. None of those happened here. The damages that flow from that should be determined by a jury. We firmly believe that Taylor Quinn should have her day in court, as well as this estate, but in particular have their day in court in front of a jury to establish these facts that are in dispute. Is there anything you would like to try to say in defense of the excessive force claim brought by the estate of the man who was holding the AR-15? I do, Your Honor. I'll address that briefly. It's addressed in the briefs, obviously. I will briefly address the fact that the person that comes out, again, he has a right to be free in his house, and I guess that gets to how far can we go as to what happens when he comes out the window. He certainly took a gun. He went out the window here, but he has the right to be free in his home. The testimony was that he didn't take the gun until they come into the house. He then goes outside. Again, this is not the Charleston officer who has the gun pointed at him. This is a state trooper who's in the bushes who testified that he knew they were going to go into the house before this fallacy of footsteps that they've talked about. Before that happens, this officer says he knows before they're knocking on the door that they're going in this house. He sets up on that perimeter waiting for Toome to come out. Zirkle had given false statements throughout this investigation. That goes back to the factual questions that are here, not just for Taylor Quinn, certainly for Taylor Quinn, but also for the estate. Zirkle had given statements to other law enforcement agencies that they hid his cruiser. He gave them false information as to why this was going on. So to have defense counsel say, well, you have to believe that he said he didn't intend these things, he's already given false information in this case. That should go to a jury. That's our position in this matter. I'm happy to answer any other questions. Otherwise, we would respectfully request that this court reverse the district court and remand this matter for trial. Thank you, sir. Thank you, Your Honors. We'll come down and shake hands and then we'll move into our next case.
judges: J. Harvie Wilkinson III, Roger L. Gregory, Toby J. Heytens